**IN THE UNITED STATES**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO:** |
| | : | |
| **v.** | : | |
| | : | **VIOLATION:** |
| **EDWARD ISRAEL SAINTIL** | : | |
| | : | **8 U.S.C. § 1324(a)(1)(A)(iv)** |
| | : | **(Encouraging and Inducing Illegal Entry** |
| | : | **of Certain Aliens into the United States)** |
| | : | |
| | : | **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Kevin E. Gounaud, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since 2004.  As a Special Agent, I have participated in, and managed numerous federal criminal and national security investigations, including matters involving fraud, corruption, bribery, immigration violations, espionage, and money laundering.  I am currently assigned to the FBI's Washington Field Office, where my duties primarily include criminal investigations related to corruption and government program fraud.  Prior to my career in the FBI, I served in the United States Coast Guard for 14 years, 10 of which as an officer.  For approximately four years, I was assigned to law enforcement duties in and about the Caribbean Basin, The Bahamas, and Haiti.  I have extensive experience and training with immigration enforcement and migrant smuggling enforcement operations related to persons attempting to enter the United States illegally from either Haiti or The Bahamas, including individuals engaged in smuggling other migrants.

2.     This Affidavit is submitted in support of a criminal Complaint charging Edward

Israel Saintil with Encouraging and Inducing Illegal Entry of Certain Aliens into the United States,

in violation of 8 U.S.C. § 1324(a)(1)(A)(iv).  I respectfully submit that the Affidavit establishes

probable cause to believe that Saintil has encouraged and induced an alien to come to, enter, and

reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry,

or residence is or will be in violation of law.  I request that the Court issue an arrest warrant for

Saintil, pursuant to Federal Rule of Criminal Procedure 4(a).

3.     The information in this Affidavit is based upon my personal knowledge and

observations; my training and experience; a review of records and documents; information

obtained from other agents, agencies, and law enforcement personnel; and witness interviews.

This Affidavit does not contain all of the information known to the Government.  It contains only

those facts necessary to support a finding of probable cause for a Complaint.  The dates listed in

the Affidavit should be read as "on or about" dates.  All of the figures, calculations, dates, and

times referenced in the Affidavit are approximations.

4.     The conversations and statements mentioned in this Affidavit are reported in

substance and in part, except where otherwise indicated.  Some of the conversations detailed below

were recorded.  The individuals in these conversations spoke in Creole, English, and Spanish.

Written translations of these conversations were prepared by FBI linguists certified in Creole and

Spanish.  For English conversations, FBI employees, including your affiant, prepared written

transcriptions of the conversations.  Portions of these written translations are quoted directly in the

Affidavit.

5.     Translations may contain minor differences when compared to the actual recording

of the conversation.  Such differences can result from the quality of the recording, non-substantive

utterances, noises made in the course of normal speech that may have implied meaning and cannot be transcribed, and the literal translation of colloquial phrases that may have a secondary meaning in a specific cultural context.

6. The Affidavit uses the abbreviations commonly used by translators and transcriptionists: [UI] means unintelligible to the translator; and [OV] means voices overlapping or individuals talking at the same time during the conversation. A dash "-" implies a disruption in the conversation, usually caused by another speaker. An ellipse "…" indicates that a subset of a longer phrase or section of the conversation is being shown.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because, as discussed more fully below, the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district. *See* 18 U.S.C. § 3238. In such cases, venue can be established in the district where the offender is arrested. Saintil is scheduled to travel to the District of Columbia on September 27, 2018. If the Court finds probable cause for the Complaint, the United States will execute the arrest warrant in the District of Columbia.

## BACKGROUND OF INVESTIGATION

### Identification of Saintil as a Subject

8. In October 2016, the FBI and the Department of State Office of the Inspector General (DOS-OIG) initiated a joint investigation of foreign nationals fraudulently obtaining visitor visas from the United States Embassy in Nassau, The Bahamas ("the Embassy").

9.      Saintil is a foreign national residing in The Bahamas.  In a 2007 visa application submitted to the Embassy, he claimed to be a Haitian national.  On a 2009 application, he claimed to be a Bahamian national.  Saintil has Haitian and Bahamian passports.

10.      Saintil came to the attention of law enforcement through another subject of the investigation, Edna St Fleur.   As discussed further below, Saintil provided fraudulent documentation to St Fleur to facilitate her attempted illegal entry into the United States.   In November 2017, at the direction of law enforcement, a Confidential Human Source (CHS) (hereinafter "CHS-1") asked St Fleur to introduce him to Saintil for the purpose of obtaining Bahamian work permits for two other Confidential Human Sources ("CHS-2" and "CHS-3"), to facilitate their illegal entry into the United States.  CHS-1 told Saintil that CHS-2 was his nephew and CHS-3 was his son.

**The Visa Process**

11.      Visitor visas (also known as "B" visas) are nonimmigrant visas for persons who want to enter the United States temporarily for business (visa category B-1); tourism, pleasure, or visiting friends or relatives (visa category B-2); or a combination of both purposes (visa category B-1/B-2).

12.      Section 214(b) of the Immigration and Nationality Act provides that an applicant for a B visa is presumed to be an intending immigrant, i.e., someone who intends to permanently stay in the United States, until the applicant establishes to the satisfaction of both the consular officer at the time of application for a visa, and the immigration officers at the time of application for admission, that the applicant is entitled to a nonimmigrant status.

13.      According to the DOS Foreign Affairs Manual ("FAM"), an applicant for a B visa must: (a) maintain a residence abroad and have no intention of abandoning that residence; (b)

intend to enter the United States for a period of specifically limited duration; and (c) seek admission for the sole purpose of engaging in legitimate activities related to business or pleasure. An applicant's permanent employment, meaningful business or financial connections, close family ties, and social or cultural associations, are considered when assessing whether an applicant has a strong inducement to return to the country of origin.  If an applicant does not establish entitlement to a B visa, the application will be denied under section 214(b).

14.     An applicant cannot obtain employment in the United States while traveling on a B visa.  The maximum duration of stay on a B visa is six months.

15.     A U.S. Embassy's Consular Affairs office in a foreign country reviews visitor visa applications, collects fingerprints, and conducts interviews of applicants to determine whether they are eligible to receive a visa.  In addition to a denial under section 214(b), a visitor visa application can be denied for other reasons such as: (a) criminal history; (b) previously remaining in the United States longer than authorized; (c) fraud or willful misrepresentation of a material fact on an application; and (d) not fully completing the visa application.

16.     Visitor visa applications are submitted electronically on a Form DS-160 via an online web-portal.  The DS-160 requests the applicant's email address and asks whether the applicant had assistance in completing the application.  The applicant must provide the name and address of anyone who provided assistance in completing the form.  It is common for persons in The Bahamas without access to a computer to hire the services of a third party to assist in completing and submitting a DS-160.

17.     On the DS-160, the applicant must disclose additional information such as: place of employment; previous travel to the United States; intended dates of travel to the United States; address where the applicant will stay in the United States; purpose of travel to the United States;

any travel companion; a contact person in the United States; a United States contact address; and information about relatives, including whether the applicant has any relatives in the United States. Upon completion of the DS-160, the applicant is required to certify that the answers furnished are true and correct.  After submission of the DS-160, applicants are scheduled for interviews with a consular officer, typically at the U.S. Embassy located in the country of application or origin.

18.     According to the website for the U.S. Embassy in The Bahamas, applicants for nonimmigrant visas are required to bring the following documents for an interview:  a current passport; a copy of their nonimmigrant visa DS-160 confirmation page showing completion of the electronic DS-160; and one color photograph of the applicant.  The website informs applicants that additional documents may be requested to establish qualification for a visitor visa.  These documents include evidence of: the purpose of the trip; ability to pay all costs for the trip; employment in The Bahamas; family ties to The Bahamas; and intent to depart the United States and return to The Bahamas.

19.     Under 8 U.S.C. § 1182(a)(6)(C)(i), an applicant who by fraud or by willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit is inadmissible to the United States.

**Bahamian Work Permits**

20.     The website for The Government of the Bahamas Department of Immigration explains the process for a non-Bahamian national to work in The Bahamas for greater than 90 days.  According to the website, the individual has to complete an application for a Long Term Work Permit and provide supporting documentation.  The Department of Immigration issues the work permit.

21.     The required supporting documentation listed on the website includes:

- A letter of request from the prospective employer stating reasons for the application, the position, and the period of time required.

- A police certificate of character covering 5 years residence in the Bahamas issued not more than six months prior to the submission of the application.

- Written reference(s) from previous employer(s) (no more than 2 in total).

- Copies of certificates of examinations referred to in the application form.

- Copies of applicable job vacancy advertisements in the local newspaper, with replies and results from interviews, if any.

- A certificate from the Department of Labour, with Notification of Vacancy attached, indicating that a Bahamian is not available to fill the position.

22.     As previously discussed, employment in The Bahamas is a factor the Embassy considers when deciding whether to grant a visitor visa.  Under section 214(b), a foreign national attempting to enter the United States (even with a visitor visa) must also establish to an immigration officer that he or she is entitled to a nonimmigrant status.  I know from my training and experience, and investigation of this case, that possession of a Bahamian work permit is an important consideration for an immigration officer when determining whether to admit a Haitian national into the United States from The Bahamas.

**Confidential Human Sources Supporting Investigation**

23.     In the course of the investigation, law enforcement has utilized multiple FBI CHSs to assist in the investigation.   Whenever possible, law enforcement agents corroborated information provided by these sources through various means, including surveillance of the CHSs, information in the DOS consular database, information found in social media, internet searches, and recorded conversations between CHSs and subjects of the investigation.  Law enforcement

agents are not aware of any instance in which any CHS involved in this investigation has provided false information.

Confidential Human Source No. 1 (CHS-1)

24.     CHS-1 is a Haitian citizen who operates a business in The Bahamas.  CHS-1 is a legal permanent resident of the United States.  CHS-1 has no known criminal record in the United States.   As of the date of this Affidavit, this is the only investigation in which CHS-1 has provided information to law enforcement.

25.     On or about September 13, 2016, CHS-1 contacted an individual not associated with law enforcement.  CHS-1 told the individual that CHS-1 was aware that a visitor visa had been fraudulently obtained from the Embassy.   The individual informed the FBI about the information provided by CHS-1.

26.     The FBI interviewed CHS-1 multiple times in September and October 2016, both telephonically and in person, to clarify and establish the initial facts of the case.  CHS-1 advised the FBI that CHS-1 learned from St Fleur, a Haitian citizen and resident of The Bahamas, that St Fleur had paid a man named Pierre Parisien, a Haitian national residing in the Bahamas,[1] to fraudulently obtain a United States visa for her.  St Fleur told CHS-1 that she provided $2,500 to Parisien, which Parisien shared with his business partner and an Embassy employee who assisted Parisien in obtaining the visa.

27.     On October 19, 2016, law enforcement agents met with CHS-1 in the United States. At that time, CHS-1 said that CHS-1 and St Fleur are acquaintances who met in The Bahamas approximately ten years ago.  During the October 19, 2016, meeting, CHS-1 agreed to assist law

---

[1]     Parisien died in February 2018.  According to information provided by the U.S. Embassy, his death was the result of an unspecified medical condition.

enforcement in this investigation and use audio and visual recording devices provided by law enforcement to document future interactions related to the investigation.

28.     CHS-1 has been paid by the FBI for expenses associated with CHS-1's assistance in this case.  As of the date of this Affidavit, the FBI has provided approximately $26,851 to CHS-1.  This amount includes approximately $10,200 for wages lost by CHS-1 while working for the FBI rather than working at CHS-1's actual place of employment; and approximately $16,651 for travel, lodging, meals, and miscellaneous expenses incurred by CHS-1 in support of the investigation.

Confidential Human Source No. 2 (CHS-2)

29.     CHS-2 is a United States citizen born in Haiti who immigrated to the United States in approximately April 2008.  At the start of the investigation, CHS-2 was an existing FBI CHS, having been recruited to assist with other investigations.  Law enforcement is not aware of any instance in which CHS-2, while acting as an FBI source prior to this investigation, provided false information.  In approximately March 2017, CHS-2 agreed to assist in this investigation by acting as a Haitian citizen attempting to obtain a visa from the Embassy with the intention of illegally immigrating to the United States.

30.     When law enforcement agents were first introduced to CHS-2, CHS-2 did not have a known criminal record in the United States.  On August 5, 2017, unrelated to this investigation or any tasking by law enforcement, CHS-2 was arrested by local police in the United States and charged with "Theft by Taking," a state felony offense.  The arrest and charge were related to a dispute with a creditor over a repossessed vehicle.  CHS-2 immediately informed investigating agents of the arrest.  Charges against CHS-2 were later dismissed by the local authorities.  There

was no contact between the prosecution team in the current matter (or anyone associated with the prosecution team) and the local authorities regarding CHS-2's criminal matter.

31.     As of the date of this Affidavit, the FBI has provided approximately $17,920 to CHS-2 related to this investigation.  This amount includes approximately $8,600 for wages lost by CHS-2 while working for the FBI in lieu of work at CHS-2's actual place of employment; and approximately $9,320 for travel expenses, meals, lodging, and miscellaneous expenses directly related to this investigation.

Confidential Human Source No. 3 (CHS-3)

32.     CHS-3 is a Haitian citizen residing in Haiti who was recruited specifically for this investigation.  CHS-3 has stated that he has never been convicted of a crime in Haiti.   CHS-3 has never visited the United States and prior to this investigation has never applied for a United States visa.  Based on the assistance provided by CHS-3 in this investigation, the Government has begun the process of applying for an S visa--a visa available to individuals who have assisted law enforcement as a witness for informant--for CHS-3.  Both CHS-1's and CHS-3's birth certificates list the same person as their father.  After CHS-3 agreed to assist in the investigation, CHS-1 informed law enforcement agents that he had recently learned that CHS-3 was in fact his son.

33.     As of the date of this Affidavit, the FBI has provided approximately $4,200 to CHS-3.  The entire amount provided to CHS-3 has been for meals and travel expenses.  CHS-3 traveled from Haiti to The Bahamas as part of the investigation.

## FACTS SUPPORTING PROBABLE CAUSE

**Fraudulent Documentation Provided to Edna St Fleur**

34.     DOS records indicate that on August 29, 2016, St Fleur submitted or caused to be submitted a DS-160 for a B1/B2 visa to the Embassy Consular Affairs office.  The DS-160 falsely

stated that St Fleur was employed as a Peer Educator for The Bahamas Red Cross on HIV/AIDS issues, and that she was traveling to the United States as part of a Bahamian Red Cross group. According to her DS-160, St Fleur intended to arrive in the United States on September 18, 2016.

35.  On August 31, 2016, a Consular Affairs officer interviewed St Fleur at the Embassy.  According to the officer's notes, St Fleur "[w]ants to transit the US to go to Trinidad.[2] Born in BAMA,[3] sent back to Haiti, returned at 10 years old.  Works for Red Cross on HIV/AIDS issues.  Been there since 2015.  Single, no children.  Lives with family, have a business downtown.  Good ties, good job.  Overcomes 214b.  Issued."

36.  On September 1, 2016, the Embassy Consular Affairs office issued St Fleur a multi-entry visitor visa with an expiration date of August 30, 2021.  However, St Fleur did not travel to the United States on September 18, 2016, as indicated on her DS-160.  She did travel from The Bahamas to Fort Lauderdale, Florida, on December 8, 2016.  She remained in the United States until approximately December 15, 2016, when she returned to The Bahamas.

37.  CHS-1 spoke to St Fleur while she was in the United States.  In these recorded conversations, St Fleur indicated that she was staying with a friend and shopping for items for resale for her family's business—which CHS-1 describes as a store that sells clothing and other items—in The Bahamas.  St Fleur never mentioned doing any work for the Bahamian Red Cross.  CHS-1 is not aware of St Fleur ever working for the Bahamian Red Cross.

38.  Law enforcement used the internet archive site https://archive.org/web ("archive.org") to review the Bahamas Red Cross website as it appeared on August 29, 2016 (the

---

[2]  Due to the relatively small size of the International Airport in The Bahamas, air travel from The Bahamas to foreign destinations is limited.  Many foreign destination flights, such as a flight to Trinidad, typically require the traveler to first travel to the United States, and then transit to the foreign destination through a location such as the Miami or Fort Lauderdale international airports.

[3]  BAMA is an abbreviation for The Bahamas.

submission date of St Fleur's DS-160); August 31, 2016 (St Fleur's interview date at the Embassy); September 1, 2016 (the issuance date of St Fleur's visa); September 18, 2016 (St Fleur's purported travel date to the United States according to her DS-160); and December 15, 2016 (the date of St Fleur's return to Bahamas from Fort Lauderdale). Archive.org is an online database that saves images of internet websites and allows a user to see a website approximately as it would have appeared at a particular point in the past. There were no references to St Fleur or any pictures of her on the Bahamas Red Cross website for any of those days.

39. On October 25, 2017, law enforcement reviewed the Bahamas Red Cross website as it appeared that day. There was no reference to St Fleur or any picture of her. The website listed individuals with specific titles such as manager or officer, as well as support staff and executive committee members. Law enforcement also reviewed the Bahamas Red Cross Facebook page and Twitter account for any references to St Fleur on or around the time she was issued a visa. There were no references to St Fleur.

St Fleur's Attempted Entry on July 20, 2017

40. St Fleur attempted to enter the United States again on July 20, 2017, by flying from The Bahamas. St Fleur was questioned by two United States Customs and Border Protection ("USCBP") officers assigned to the airport in Nassau. According to the USCBP officers' written reports, St Fleur provided contradictory information about her employment in The Bahamas. St Fleur indicated in her first interview that she was not employed. During a second interview by a different USCBP officer, St Fleur first stated that she was unemployed, but used to work at the Embassy until she was fired five months earlier. In fact, St Fleur has never worked at the Embassy. Upon further questioning, St Fleur then stated she worked as a bartender in Nassau. At no time did she claim to work for or have worked for the Bahamas Red Cross.

41.     St Fleur did not have a return ticket to travel from the United States back to The Bahamas.  She claimed she would be staying at a hotel, but said that she did not have a reservation.  Based on the combination of these factors, and without any knowledge of the on-going investigation, USCBP denied St Fleur entry into the United States.  USCBP did not cancel her visa.  Officers advised St Fleur that if she wanted to travel to the United States in the future, she would have to more clearly demonstrate her reason for travel, provide documentation demonstrating her ties to The Bahamas, and provide evidence of her financial solvency.

<u>St Fleur's Attempted Entry on October 13, 2017 with Fraudulent Documents</u>

42.     In a September 28, 2017, recorded conversation in The Bahamas between CHS-1 and St Fleur, St Fleur stated that she was again planning to travel to the United States.  St Fleur explained that she had agreed to pay $1,600 to an unnamed person in order to obtain a Bahamian work permit so she could attempt to enter the United States and demonstrate proof of her employment in The Bahamas.

43.     In an October 10, 2017, recorded conversation between St Fleur, CHS-1, and CHS-3, St Fleur stated that she wanted to "settle" in the United States.  She said that she would travel with the man whom she had paid to produce employment papers for her and that she would claim that he was her employer.  The following excerpted conversation occurred about the man who was supposed to be her employer:

ESF:      And he's like…he's my boss, so…

CHS-1:   Oh, he's your boss?

ESF:      Yeah, so he the one who do all the document.

CHS-1:   Oh, so that's what you meant when- when- when you say he did the paper for you?

ESF:      Yeah.

CHS-1:      He sponsor you or he lie for you; he says that you do the work for him.

ESF:        Um-hum.

CHS-1:      Okay. I understand.

44.       On October 13, 2017, St Fleur attempted to enter the United States through the international airport in Nassau.  She was again questioned by USCBP officers.  According to the interviewing officers' written statements and a recording of her second interview that day, St Fleur stated that her boss, Saintil, had purchased her airline ticket and that she was traveling to Fort Lauderdale, Florida, with Saintil to purchase clothes to sell at Saintil's apparel shop in Nassau. When questioned, St Fleur did not know the name of the shop where she purportedly worked and could not produce pay stubs.  As proof of her employment in The Bahamas, St Fleur provided a Bahamian work visa indicating that she was a "General Worker" sponsored by Saintil.  USCBP officers confirmed that Saintil was on the same flight to the United States as St Fleur, but did not attempt to interview Saintil.  USCBP, which was not aware of the current investigation, denied St Fleur entry into the United States and cancelled her visa.

**Saintil's Agreement to Provide Work Permits for CHS-2 and CHS-3**

<u>January 9, 2018 Meeting Between Saintil and CHS-1</u>

45.       On January 9, 2018, at the direction of law enforcement, CHS-1 met with St Fleur and Saintil at a restaurant in Nassau, Bahamas.  The conversation was recorded.  Saintil told CHS-1, "I do immigration services."  Saintil further described his position as a "justice of the peace."

46.       Saintil stated that he had a relationship both with the new Director of Immigration,[4] Clarence Russell, as well as the former Director of Immigration, [William] Pratt.  Saintil noted

---

[4]   According to multiple media reports from the Bahamas, in early January 2018, at the direction of the Prime Minister, Clarence Russell, the former Passport Office Director, replaced William Pratt as the Immigration Director.

that he preferred Pratt over Russell because he was more of a "businessman" and that Russell had been brought in "to change the situation in immigration."   Saintil claimed that he used to work with Russell in the "passport office."

47.     Saintil told CHS-1 that he used money to create a "path" for his customers in immigration.  Saintil explained that the immigration staff would ignore legitimate applications and would "…only work on the part where they're making money."   The following is an excerpt of the conversation that followed:

CHS-1:     So in other words it's illegal what they're doing.

ES:         Yeah. What they tried to do, the person who have the things legally, they try to put it on the same side, pay big amount [UI].

CHS-1:     So they want everybody to pay money-

ES:         Oh yeah,

CHS-1:     -or you don't get it.

ES:         Or you don't get it. Yeah. That's the problem.

48.     CHS-1 told Saintil that CHS-2 and CHS-3 had previously come to Nassau from Haiti and attempted to obtain U.S. visitor visas, but were denied because they did not have Bahamian work permits.  The following is an excerpt of the conversation that followed:

ES:         If, If, I knew that, I shouldn't of let you waste that money.  I wouldn't have let them waste their money.  Cuz, OK, any country you live that is not your, ah, ah, ah, what call it, the country where, where you born, or where you have status, Haiti, Jamaica, here, to apply for a visa, you need some type of status.

CHS-1:     Yes.  Yeah, I find that out now.  Which is why I'm talking to you now.

ES:         You understand?  So that's why when you get a US visa, or when you get refused, they say that – they give you a letter saying that, you know, your information is not enough to convince the consular you been approved.  And then, you know, so whenever your situation will change, you can come back whenever, you know?

CHS-1:     Whenever you have the proper document.

ES:        Yeah.  The proper document.

CHS-1:     Which is the work permit?

ES:        Yeah.

49.     CHS-1 asked Saintil how much it would cost for CHS-2 and CHS-3 to obtain work permits.  Saintil quoted a total cost of $11,000 to obtain Bahamian work permits for both CHS-2 and CHS-3.  Saintil broke down the payment for each as follows:

a.     $1,500 to get a Bahamian national to sign a letter as a "boss," i.e., a fake employer, for CHS-2 and CHS-3.  Saintil subsequently explained that he would keep half the fee for himself;

b.     $2,500 "for the Director or whoever to approve," the application, i.e., the bribe payment;

c.     $1,500 for other expenses including a $100 application fee to the Immigration Department, payments for a Labor Department certificate, expenses associated with advertising the alleged position to be taken by CHS-2 and CHS-3 in the Nassau newspaper for three days, payments to other officials, costs for a police certificate, costs for a medical certificate, and profit for himself.

50.     CHS-1 and Saintil discussed the fact that the works permits were not for actual employment in The Bahamas, but rather to facilitate the granting of visitor visas for CHS-2 and CHS-3.  The following is an excerpt of that conversation:

CHS-1:     Yeah, I'm doing all this work to get them into the United States.  That's the thing.  They're not gonna work here for real. They're not going to nothing here, but they're just pretending. Which is what you doing for me.  And once they get it, then they - they going to the United States.

ES:        Ok, yeah, when the come, I will work on the letter, I will make sure I have someone, I get a person to sign as the boss, I get a person who have access to travel in the United States.  When the boss have access to travel in the United States, it's easier to, um, get, visa for them.  Because when the boss write letter saying he need this person [UI] will travel, so I want them to travel with me, and blah blah blah like that.  It should be - it should be easier.

51.        Saintil claimed that he had six or seven other approved work visas from in or about December 2017 in his car and that he was withholding these cards from the recipients because they owed him money.

52.        At the conclusion of the meeting, CHS-1 advised Saintil that the quoted price for the work visas was too high.  CHS-1 asked Saintil to go back to whomever he was dealing with in the Immigration Department and ask if they would accept less in exchange for CHS-1 paying for two applications in lieu of one.  Saintil promised to contact CHS-1 the following day with a response.  CHS-1 and Saintil agreed to communicate by WhatsApp messenger and telephone regarding the work visas and a future meeting.

January 10, 2018 Meeting Between Saintil and CHS-1

53.        On January 10, 2018, CHS-1 met with Saintil at a restaurant in Nassau.  Saintil attended this meeting with two women, including one woman introduced as Saintil's wife.  The meeting was recorded.  Saintil explained that he had contacted his person in the Department of Immigration about the price, i.e., bribe payment, for the work permits.  Saintil said:

I spoke with the person to see like, perhaps, that, you see, when I tell you he wants like two thousand and five hundred dollars on one, I was trying to bring it down like to two thousand dollars each for him, to see if we could take like a thousand dollars for you.  But he say no, he cannot do it like that.  It's got to be, um, it's got to be two thousand and five hundred dollar, five hundred dollars each.

54.        Saintil explained that the inflexibility of the bribe amount was due to competition by different ethnic groups and nationalities paying bribes to officials.  The following is an excerpt of that conversation:

ES:     …people like the Director of Immigration or some - the Assistant Director - they don't deal with small amount with people, you understand?

CHS-1:  Mmmhmm.

ES:     So, that's why they deal more with the Chinese.  The Chinese paying like ten thousand, fifteen thousand dollars for just one work permit.

CHS-1:  Umm, okay.

ES:     You understand?  But then, then-the nationality that pay less for work permit in the Bahamas is Haitian.

CHS-1:  Okay.

ES:     Jamaicans pay a lot – and the Jamaican be the same amount, but the Spanish people – the [stutters] Spanish and the Chinese.  It's absurd they make money off.  You know, they pay a lot of money.  That's why like, the only way, that when you see – to senior officer in the immigration department or some officers, when they ask you for set amount, so, you got to make sure like what they ask for, you come with it, otherwise, you know, you might not get it, because like they have, like, some, the other nationality to make money off.  You understand?

55.     Saintil reiterated to CHS-1 that he understood that the intent of getting work permits for CHS-2 and CHS-3 was for both to immigrate to the United States.  The following is an excerpt of that conversation:

ES:     "… And I promise you, everything will go smooth.  When they come over, as you said that you want them to go in the state, I will make all arrangement for them to get a US visa, flew, to flew to fly in the state, you know.  Fly in the state.

CHS-1:  Mmm.  Which is good.  That sounds very good [OV] because it's the purpose why I get you so that you can go to the state, you know that.

ES:     [OV] Yeah, yeah, get into the US.  I do, I do these application for people.  I, I fill out the visa form for visa and everything, you know what I'm saying?

CHS-1:  Uh huh.

ES:     So I'm not going to charge you big for, I'm just going to charge you the, the fee to put in the application like and do the bank letter to say that you should have

an account.  And then, you know, even like if you don't have an account at the bank, I can get the letter-

CHS-1:       Mmmhmm

ES:          -from the bank saying that you have some money in their account and blah, blah, blah.[5]  You know, we go from there.  And the people, the person, the people who can sign for the permit, I tell you the signer is someone who have access, and the people have access to fly to the United State.  So when they're checking the system they'll see the person who sign as the boss of, is someone who gonna have access to the United State, gonna make it easy [ES snaps fingers] for the person, for the application get a visa… I do visa applications and things.  So I know how to make arrangement for them to be qualified to get a visa.

56.    Saintil and CHS-1 agreed that Saintil would supply the two work permits for a total price of $10,500.  Saintil offered to travel to the United States on February 10, 2018, to meet CHS-1, collect documents for CHS-2's and CHS-3's work permit application, and collect payment from CHS-1.

February 9, 2018 Meeting to Pick Up Suitcase for Saintil

57.    On February 7, 2018, Saintil contacted CHS-1 by WhatsApp Messenger.  Saintil asked CHS-1 to go to 8210 SW 9th Court, North Lauderdale, Florida, to pick up a suitcase and several packages from Monette Pierre-Jean.  Saintil wanted CHS-1 to deliver the items to Saintil when Saintil arrived at the Fort Lauderdale airport on February 10, 2018.  CHS-1 agreed to the request.

58.    On February 9, 2018, CHS-1 went to the address and met a woman named "Monette."  CHS-1 told her that Saintil was assisting CHS-1 to bring CHS-2 and CHS-3 to the

---

[5]    As previously discussed, meaningful financial connections to The Bahamas is one factor a consular affairs officer considers when determining whether an applicant for a visitor visa has a strong inducement to return to The Bahamas.  A "bank letter" would help establish such a connection.

United States.  Monette offered to arrange a marriage for them to a U.S. citizen for $10,000 per marriage.  Monette provided a suitcase to CHS-1 for Saintil.

February 10, 2018 Meeting Between Saintil and CHS-1

59.     On February 10, 2018, Saintil flew from The Bahamas to Fort Lauderdale.  CHS-1 met Saintil at the Fort Lauderdale airport.  Their meeting was recorded.  CHS-1 gave Saintil the suitcase that he had picked up.  He also provided Saintil a copy of CHS-3's passport and two passport-sized photographs.  Saintil indicated he would use them to obtain a work permit for CHS-3 by early April 2018.  CHS-1 provided $5,500 in cash to Saintil for the promised work permit. CHS-1 promised to pay Saintil an additional $500 upon receipt of the permit if Saintil brought it to the United States.  Saintil agreed to do so.  CHS-1 and Saintil agreed that CHS-1 would purchase a second work permit for CHS-2 after obtaining CHS-3's permit.

60.     Saintil and CHS-1 discussed how a portion of CHS-1's $5,500 payment would be used to bribe a Bahamian official.  The following is an excerpt of that conversation:

CHS-1:     Then you said that, uh, why it's five and a half because you have to pay the Chief of Immigration.

ES:        Yeah – three thousand dollars for, for the bribe.  Yeah, and things, yeah, I get you, yeah, that's what it was.  Yeah.  That's what it was.

61.     Saintil told CHS-1 that after the Department of Immigration approved a one-year work permit, it charged a $1,000 fee for the applicant to pick up the permit.  Saintil advised CHS-1 that he had included the $1,000 fee as part of CHS-1's $5,500 payment.

62.     Saintil explained how he planned to obtain an employment letter for CHS-3 to support CHS-3's visa application:

Yeah, so I told you, like, the person who sign for him as boss - that's what I do, I, I, I find someone who have a clean record, who have no problem.  So, that the person – you can't just apply for a visa and say that you work with someone.  You need a letter from them, from your employer, in order to, for to apply for a visa.  So, that's why I will find someone

who have business, OK, so like, to apply for him, to say that, OK, I want to travel with him to come in the States and then to do some shopping or thing to make it easier.

63.     Saintil advised that since he often travelled to the United States, he would use someone else to sign CHS-3's work letter[6] so that CHS-3's travel would not be connected to Saintil.

64.     Saintil told CHS-1 that he was carrying five or six different Bahamian work permits to deliver to different customers in Haiti.  Saintil showed several of these cards to CHS-1, including two cards indicating that the recipients were allegedly employed by "Saintil's Painting and Cleaning" as a "Handyman."

Supporting Documentation for CHS-3's Work Permit

65.     On April 30, 2018, Saintil sent images of the following three documents to CHS-1 via WhatsApp messenger:

a.     A letter dated March 29, 2018, addressed to the "Immigration Department," attention "Mr. Clarence Russell," from "Saintil's Painting & Cleaning Services."  The subject of the letter was CHS-3.  The letter stated, "Please accept this letter on behalf of the above-captioned to work under my Company employment as Handyman for a period of one (1) year.  He is an individual I have known personally with skills and abilities to help my company to grow."  The letter had a signature block for "Edward I. Saintil, CEO," but no signature.

b.     A Royal Bahamian Police Force criminal records check report, dated March 01, 2018, in the name of CHS-3 indicating CHS-3 had not been convicted of a criminal offense in The Bahamas.

---

[6]   Based on my training and experience, and investigation of this case, I believe that Saintil's reference to a "workletter" does not mean a letter to the Department of Immigration to obtain a work permit for CHS-3.  It means a document that CHS-3 can present to the U.S. Embassy regarding his purported employment to support his visa application (along with his work permit).

       c.     A Bahamian Government Labour Department certificate issued on March 12, 2018, to "Saintil's Painting & Cleaning" replying to its "request for Handyman" position for CHS-3.  The letter advised that "there are no Bahamians for this position at this time."

<u>May 11, 2018 Meeting Between Saintil and CHS-1</u>

66.     On May 11, 2018, Saintil flew from The Bahamas to Fort Lauderdale.  CHS-1 met Saintil at the airport.  Their meeting was recorded.  Saintil said that St Fleur was working at a photo processing store in The Bahamas.  Saintil stated that St Fleur was not again going to attempt to obtain a visa to the United States.  Instead, she was in the process of buying a Bahamian passport from Saintil for $3,000.

67.     CHS-1 asked Saintil if Saintil was aware that "Herodine[7]" had offered to arrange a marriage to a U.S. citizen for CHS-2.  Saintil replied that he could arrange for the marriage to occur in either The Bahamas or Haiti.  The following is an excerpt of that conversation:

ES:     This can happen in, in Bahamas just let the person come while I get, the uh-

CHS-1:     Mmhmm.

ES:     -the work permit for him for one year.

CHS-1:     Mmhmm.

ES:     By that time, you know, the person can come in the Bahamas, marry him, and then do all the process and then he would be able to come and stay [OV].

CHS-1:     [OV] So then what she told me, you know about it, I don't need to talk to her?

ES:     Yeah [laughing].

CHS-1:     It's something you can handle for me?

ES:     Yeah. [laughs] Okay one thing, I don't talk my business to people like - you understand what I mean?  I choose to tell you.

---

[7]    I believe that CHS-1 mistakenly said "Herodine" rather than "Monette."  When CHS-1 met "Monette," as referenced in paragraph number 58, a woman named "Herodine" was also present.

68.     Saintil advised that a marriage for one person would cost approximately $13,000. Saintil offered to arrange a marriage for CHS-3.  Saintil explained to CHS-1 that there were advantages to obtaining citizenship through a fraudulent marriage over attempting to obtain a visa to enter the United States.  The following is an excerpt of that conversation:

ES:     Alright?  So, um, that's why it will be better- [lowers voice volume] it will be better when he come over if you want to do the marriage for him, it be better. Because okay, let me show something. If I go to get visa from-

CHS-1:  When you say the "marriage for him," you mean to marry the citizen- a U.S. citizen-

ES:     The US citizen to come over and marry him and then come here [meaning the United States], legally.

CHS-1:  To go- marry him where?

ES:     In Nassau.

CHS-1:  Oh, okay.

ES:     In The Bahamas, he don't have to go to Haiti to get marriage. Cause he in Nassau, legally,[8] with the work permit and thing.  So anyone come in and marry him, all the process and be done, at the Embassy.

CHS-1:  Okay.  At the Embassy in?

ES:     In Nassau.

CHS-1:  OK.

ES:     In Nassau. Because he, he doing it legally[9] with a work permit and thing- so anything - he can do anything in that country legally.  Because he be legal.

CHS-1:  Eh – you did one before one before in Nassau, and you, they took care of anything in Nassau, and you sure [OV] it will work in Nassau?

---

[8]     CHS-3 would be "legally" in The Bahamas due to Saintil fraudulently obtaining a work permit for him.

[9]     Although the sole purpose of the marriage would be to obtain U.S. residency for CHS-3, the marriage would be "legal" in that there would be an authentic marriage certificate.

ES:         [OV] Yeah, yeah, mon, do that for plenty people, I tell you, I didn't know who you were with, I did not tell you everything on the phone, but I mean, that's what I did, you know, that's what I did before.

CHS-1:      And everybody that you did that for-

ES:         Yeah-

CHS-1:      Work perfectly [OV] They get there citizenship and all?

ES:         [OV] Perfect. Perfect.

Approval of CHS-3's Work Permit

69.     On August 1, 2018, Saintil sent CHS-1 an image of a letter, dated August 1, 2018 from the Immigration Department stating,

> This refers to your application requesting permission to employ [CHS-3] as a Handyman for a period of two (2) years.  I am directed to inform you that the application has been considered by the Immigration Board and approved until July 31, 2020 subject to a payment of a fee of $2,000 . . . for the work visa.

This letter was signed and stamped by "Fausteen Y. Major-Smith," Assistant Director.

70.     On August 1, 2018, Saintil and CHS-1 spoke by telephone about the letter.  The conversation was recorded.  Saintil informed CHS-1 that the official he had bribed at the Department of Immigration had unexpectedly approved CHS-3 for a work permit for a period of two years instead of one year.  Saintil said that an additional $1,000 would have to be paid to the Department of Immigration for the two-year permit.  As previously discussed, the fee for a one-year permit was $1,000.  Saintil had incorporated this fee in the $5,500 that CHS-1 paid him.  The fee for a two-year permit was $2,000.  Saintil explained the benefit of a two-year permit in the following conversation:

ES:         So now, if, if, if he has to be here for an additional year you don't have to renew-

CHS-1:      Mr. Saintil, can I remind you of something?

ES:         Mmhmm.  Go ahead.

CHS-1:   Ok, remember, I'm only doing this for my son to come live with me in the United States, I'm not going to renew nothing.

ES:   Yeah.

CHS-1:   Once I got this paper, then I just going to do –

ES:   Yeah.

CHS-1:   Then -

ES:   I know, I know, I just bring you an example.  But I mean, I, I, I know, I know, I just saying, you understand?  I just saying, just in case, but, um, I'm, I show you the advantage that is coming up when they give it for two years.  I mean, like it's easier to, to get whatever we're going to deal with. You understand? Like, then – when, when we go to US Embassy for visa blah blah blah, they will see this person have a permit here for two years.  And then, you know? So, it's, it's, it's, It make the case stronger.

71.     Saintil told CHS-1 that he had paid $3,000 to Fausteen Major-Smith for the work permit approval.  Saintil said his wife had made the payment that day.

72.     In a recorded phone conversation between CHS-1 and Saintil on August 2, 2018, Saintil instructed CHS-1 to wire transfer the additional $1,000 for the two-year work permit. Saintil said that MoneyGram had blocked him from receiving funds.  Saintil explained that CHS-1 could use another wire service or send the funds to "Micheline Joseph" via MoneyGram.  On August 2, 2018, CHS-1 wired $1,000 to Saintil via Western Union.

73.     On August 2, 2018, Saintil, in a recorded phone call with CHS-1, requested that CHS-1 send an additional $600 for other expenses incurred by Saintil for CHS-3's work permit and his travel to meet with CHS-1.  On August 3, 2018, CHS-1 sent an additional $600 to Saintil through a MoneyGram wire transfer to Micheline Joseph.

74.     On August 9, 2018, Saintil sent CHS-1 an image of a Commonwealth of the Bahamas work permit in the name of CHS-3.  The permit indicated that CHS-3 was employed as a "Handyman" for "Saintil Painting and Cleaning."

<u>August 18, 2018 Meeting for Saintil to Provide CHS-3's Work Permit to CHS-1</u>

75.      On August 18, 2018, Saintil flew from The Bahamas to Miami.  CHS-1 met Saintil at the airport.  Their conversation was recorded.  Saintil gave CHS-1 a Commonwealth of the Bahamas Work Visa card in the name of CHS-3.[10]  The card was identical to the image sent from Saintil to CHS-1 on August 9, 2018.

76.      CHS-1 and Saintil discussed obtaining a work permit for CHS-2.  Saintil said that it would cost more for CHS-2 because of problems and cost increases encountered by Saintil in obtaining CHS-3's work permit.  Saintil then volunteered to CHS-1 that he had another way to get CHS-2 and CHS-3 to the United States.  The following is an excerpt of that conversation:

ES:        OK.  One thing I want to offer you, uh, before I go further, right?

CHS-1:   Yeah.

ES:        So I have a connection with a white man who has a boat – a private boat.  When people here I, I, I, I have like, um, a couple people who book with me already. He just go on his private boat.  And then, you know, it's, it's, it's something small, so but he, [stutters] it's a lot, cost a lot.  When I say a lot – 6500 dollars is the charge to do it.

CHS-1:   On a boat?

ES:        From, from, from, from, from Bimini to – to, uh, uh, um Miami or Fort Lauderdale, right?  But let me phone my cousin to find out.

CHS-1:   And you say he did that, uh, a few times already and everything went successfully?

ES:        Huh?

CHS-1:   Everything, I mean, whenever he bring people they always get here safe?

ES:        Safe, easy.

---

[10]   Investigators familiar with Bahamian work permits examined the card.  It appears to be an authentic work permit. To conclusively establish its authenticity, the Government would have to speak to an official in the Bahamian government.

77.     Saintil said that he would fly from Nassau to Bimini with CHS-3.  However, the $6,500 price did not include the ticket from Nassau to Bimini.  From Bimini, CHS-3 would be placed on a boat to Florida.[11]

78.     CHS-1 and Saintil also discussed CHS-3's purported employment with Saintil.  The following is an excerpt of that conversation:

CHS-1:     Because when he [CHS-3] come-

ES:        Um hmm.

CHS-1:     Of course you know I'm going to try to get the B visa for him so he can come here [the United States]-

ES:        Yeah.

CHS-1:     - to work with me.

ES:        Exactly, yeah.

CHS-1:     But when he come at the beginning of, ah, September-

ES:        September.

CHS-1:     Uh, I'm going to, eh, the, try to get him the visa, and for him to get that he's going to need a job.

ES:        Yeah.

CHS-1:     And although your name is on his work permit.

ES:        Work permit, yeah.

CHS-1:     But he's not, uh, you know, he's not working for you for real.   That's something, a fake thing-

ES:        Yeah, that's to, that's to-

CHS-1:     -you do, in a way you do a fake thing for him to be able to come over.

ES:        Yeah, yeah, exactly, exactly.

---

[11]   Bimini is the western most group of islands in the Bahamas, located approximately 50 miles east of Miami.  It is a common departure point for smuggling to the United States.

79.     During the meeting, CHS-1 provided $1,100 to Saintil as a down payment for CHS-2's work permit.  CHS-1 and Saintil also discussed arranging a marriage between CHS-3 and a U.S. citizen.  Saintil said that his female cousin assists him.  Saintil told CHS-1,  "And then, like I said, and for your son, I'll talk to my cousin, um,  tomorrow, um, I mean into looking for a female, for him, but I mean, you got to let me know what time you are ready…"

80.     CHS-1 advised Saintil that he was ready to make this transaction whenever Saintil was ready.  CHS-1 told Saintil that in September 2018, CHS-1 would be receiving $16,500 from a new job in the District of Columbia.

81.      Saintil has agreed to meet CHS-1 in the District of Columbia on September 27, 2018.  The purpose of the meeting is for CHS-1 to pay Saintil for smuggling CHS-3 to the United States and arranging a marriage with a U.S. citizen.  At the direction of law enforcement, CHS-1 will provide approximately $14,000 to Saintil.

82.     If the Court finds probable cause for the issuance of a Complaint, law enforcement agents will execute the arrest warrant at the conclusion of the meeting between Saintil and CHS-1.

## **CONCLUSION**

83.     Based on the foregoing, your affiant respectfully submits that probable cause exists to believe that Saintil has violated 8 U.S.C. § 1324(a)(1)(A)(iv).  I respectfully request that the Court issue an arrest warrant for Saintil.

The statements above are true and accurate to the best of my knowledge and belief.


_____

Kevin E. Gounaud
Special Agent
Federal Bureau of Investigation


SUBSCRIBED and SWORN to me this 26th day of September, 2018.


_____

Robin M. Meriweather
United States Magistrate Judge